## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES HARKER,<br><br>       *Plaintiff*<br><br>       v.<br><br>META PLATFORMS, INC.,<br>ASSOCIATION OF INDEPENDENT<br>COMMERCIAL PRODUCERS, INC.,<br>SOMETHING IDEAL, LLC, doing<br>business as "M SS NG<br>P ECES," and BBDO WORLDWIDE, INC.<br><br>       *Defendants.* | Civil Action No.: 1:23-CV-07865<br><br><br>**AMENDED COMPLAINT AND<br>JURY DEMAND** |

Plaintiff James Harker, by and through his undersigned counsel, hereby

avers:

### NATURE OF THE ACTION

1.    This lawsuit is about a race-based hiring program called "Double the

Line," which intentionally discriminates against white men and women, in violation

of the Constitution and laws.

2.    "Double the Line" was created by the Association of Independent

Commercial Producers ("AICP") to benefit "Black Indigenous People of Color"

("BIPOC") and to exclude non-BIPOC individuals.

3.    The unlawful and immoral intention and purpose of "Double the Line"

is to discriminate between, and steer jobs and independent contracting opportunities

to, individuals based on their race, color, and/or national origin to "push forward a

1

demographic shift." Equity and Inclusion, AICP, https://bit.ly/3Z3P1sr.

4.      Meta Platforms, Inc. ("Meta"), BBDO Worldwide, Inc. ("BBDO"), and Something Ideal, Inc. conspired and combined with AICP to support and implement "Double the Line."

5.      James Harker is an experienced motion picture lighting technician who, for over twenty-seven years, has worked on major commercial, feature film, and television productions, primarily as an electrician and as a member of the crew behind the camera.

6.      Yet because he is a white man, the Defendants targeted him for discrimination, stigma, and cancellation.

7.      The Defendants have denied Mr. Harker equal rights in violation of 42 U.S.C. § 1981.

8.      The Defendants have conspired to violate Mr. Harker's civil rights in violation of 42 U.S.C. 1985(3).

9.      Something Ideal, Inc. has violated Mr. Harker's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 et seq., by intentionally discriminating against him because of his race, color, or national origin.

## THE PARTIES

10.      The Plaintiff, James Harker, is a New York citizen with his primary residence in Brooklyn, New York.

11.      Defendant Meta Platforms, Inc. maintains its headquarters in Menlo Park, California, and is incorporated in Delaware. Defendant Meta has a registered

agent and can be served at 80 State Street, Albany, NY 12207.

12.    Defendant, Something Ideal, LLC, d/b/a "M SS NG P ECES" has its principal place of business in New York and is a Florida Limited Liability Company. Defendant Something Ideal, LLC, has a registered agent and can be served at 801 US HWY 1, North Palm Beach, FL 33408.

13.    Defendant BBDO Worldwide, Inc. ("BBDO") has its principal place of business in New York and is a New York Corporation. Defendant BBDO has a registered agent and can be served % Corporation Services Co., 80 State Street, Albany, NY 12207.

14.    Defendant AICP has its principal place of business in New York and is a New York Not-For-Profit Corporation. Defendant AICP has a registered agent and can be served % Drechsler & Leff, 292 Madison Ave., New York, NY, 10017.

## JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the federal claims arise under the Constitution and laws of the United States.

16.    This Court has supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367(a).

17.    Plaintiff seeks declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202. Plaintiff seeks compensatory and punitive damages under 42 U.S.C. §§ 1981, 1985(3), 1986, 1988, and 42 U.S.C. § 2000e et seq. and the New York Human Rights Law.

18.     Venue is proper in this District under 42 U.S.C § 2000e-5(f)(3), and 28 U.S.C. § 1391(b)(2).

## FACTS

### A.     The Double the Line Program Created by AICP.

19.     Defendant AICP is an association of commercial production companies.

20.     According to the AICP, its members account for 80-85% of all motion picture ads in the United States. AICP at a Glance, AICP, https://bit.ly/47NVJH0.

21.     The AICP created and supports the "Double the Line" ("DTL") initiative as part of its Equity and Inclusion Program.

22.     DTL is described by the AICP on its website as follows.

> What does it mean to #doubletheline? It's simple. On every commercial production, roles for the project are listed on individual lines in the budget with their associated costs.

> On every job you are bidding, the agency and/or client will consult with the production and post production company and based on potential candidates, costs, and opportunities, will agree to double the role of any single position on the bid. In doing so, they agree to cover the costs to hire a BIPOC candidate to work alongside the chosen role.

*Double the Line*, AICP, https://bit.ly/3OXQ095.

23.     The AICP defines "BIPOC" to mean "Black Indigenous People of Color" and uses the term to target and exclude white people because of their race, color, or national origin.

24.     The AICP justifies this unlawful and immoral racial discrimination on the grounds that:

> Many agencies and clients are reaching out to production and post

companies asking how to add mandates to the bidding process to increase diversity among crew.

We are asking clients and agencies to take the pledge to #doubletheline so that we can increase diversity and inclusion with an emphasis on leadership positions.

*Double the Line*, AICP, https://bit.ly/3OXQ095.

25.    Defendants Meta, BBDO, and Something Ideal are examples of such "clients and agencies."

26.    The AICP describes how DTL works this way:

Once the role is agreed upon, the final total of that budget line (including the appropriate P&W, insurance, etc.) would be duplicated on a separate line item labeled "Double the Line." Production and post companies can make this "Double the Line" line item cost plus and provide any required back up. In this way, the total amount invested is clear on every project and makes the monetary investment accountable and measurable.

*Double the Line*, AICP, https://bit.ly/3OXQ095.

27.    The AICP's website contains an "FAQ" explaining that clients, production companies, and ad agencies should participate in the DTL initiative because "In order to increase the diversity of crew at all levels of the process, we have to acknowledge that a primary issue we face is access to our industry." *Double the Line*, AICP, https://bit.ly/3OXQ095.

28.    The AICP website provides additional clarity on the scope of the agreement between the various parties, including the agency, client, and production company:

The way it [DTL] works is simple. An agency or client commits in advance to #doubletheline in their bidding specs. In bidding, the production or post company will identify one or more lines they'd

> suggest be doubled, based either on potential candidates they know, the nature of the job, or a predetermined financial commitment. Once the role is agreed upon, the final total of that budget line (including the appropriate P&W, insurance, etc.) would be duplicated on a separate line item called "Double the Line." Production and post companies can make this "Double the Line" item cost plus and provide any required backup. In this way, the total amount invested is clear on any project and makes the monetary investment accountable and measurable.

*Double the Line*, AICP, https://bit.ly/3OXQ095.

29.     The AICP even provides resources to find BIPOC-only candidates with a list of other organizations that primarily focus on hiring only black candidates, such as "Black in Post," which focuses solely on black artists in post-production work. *Talent Resources*, AICP, https://bit.ly/3QXBBwc.

30.     It explains:

> For instance, an agency or client would commit to spending $15k and the production company could suggest they double the line for the producer. Whether it's someone coming from television, or a producer that they have been working with in music videos and want to continue their training. The agency or client would agree, thereby allowing a BIPOC producer to work alongside the commercial producer in a paid capacity.

> The idea is to pick one line that allows a candidate who has not previously had access to our business, but is qualified in the role, to have access to the production to learn the nuances around commercial production in a real, hands on way.

*Double the Line*, AICP, https://bit.ly/3OXQ095.

31.     The AICP explains that the production company is responsible for "identifying, hiring, and educating" the DTL candidates. *Double the Line*, AICP, https://bit.ly/3OXQ095.

32.     The AICP further explains that the funds invested in the DTL initiative

can be categorized and tracked because the funds are "clearly labeled in the budget on their own dedicated line to easily allow a production, post production company, agency, or client to track the monies invested." *Double the Line*, AICP, https://bit.ly/3OXQ095. Specifically:

> Once the role is agreed upon, the final total of that budget line (including the appropriate P&W, insurance, etc.) would be duplicated on a separate line item labeled "Double the Line." Production and post companies can make this "Double the Line" line item cost plus and provide any required back up. In this way, the total amount invested is clear on every project and makes the monetary investment accountable and measurable.

*Double the Line*, AICP, https://bit.ly/3OXQ095.

33.     The intent and purpose of the DTL initiative and of the AICP's "Equity and Inclusion program" is to encourage, facilitate, and promote facially illegal race-based hiring to "push forward a demographic shift" and to stigmatize, target, harm, demote, constructively discharge, refuse to hire, and intentionally discriminate against white people like Mr. Harker solely because of their race, color, and national origin.

## B.     James Harker's Work Experience.

34.     James Harker has worked for over twenty-seven years as an electrician on major commercial, feature film, and television productions.

35.     Most of his work over the last twenty-seven years was done as a gaffer, best boy, or electrician. A gaffer is the most senior or highest-level electrician on a production, while a best boy electrician has supervisory duties over the other electricians and reports to the gaffer.

7

36.     Mr. Harker's experience generally, and as a gaffer particularly, includes understanding protocols, work practices, and electrical equipment as essential to maintaining the safety of the set because they are dealing with high voltage cables, sophisticated equipment unique to the industry, and complicated equipment rigging techniques necessary to prevent the risk of fire or electrocution to the cast and crew, as well as countless other potential injuries.

37.     Mr. Harker has primarily worked in lower electrical positions on set during his career, such as an electrician, best boy electrician, and generator operator, but he would like to increase his experience as a gaffer. Harker Dec. at ¶ 9 (attached as Exhibit 2).

38.     Mr. Harker is a former union member with the International Alliance of Theatrical State Employees ("IATSE") Local 52.

39.     Mr. Harker withdrew from the union before the December 14, 2022, production.

### C.     The December 14, 2022, Production.

40.     On December 12, 2022, Mr. Harker received an email from the production supervisor, Shun Tsuchiya, and was offered a position as Best Boy Electrician for a commercial being made on December 14, 2022. Harker Dec. at ¶ 5.

41.     Mr. Harker did not apply for a position and was unaware of any application process. Harker Dec. at ¶ 6.

42.     His only contact for the job was the communication from Something Ideal's production supervisor, Shun Tsuchiya.

43.     He was not offered any gaffer positions. Harker Dec. at ¶ 8.

44.     He accepted the Best Boy position. Harker Dec. at ¶ 7.

45.     On December 14, 2022, Mr. Harker's responsibilities included supervisory responsibilities, organizing equipment, managing the work of electricians according to the needs of the gaffer, and ensuring all the crew members' paperwork (their W-2 forms, NYS wage forms, timecards, etc.) were completed and submitted.

46.     Listed on the Call Sheet for the December 14, 2022, Meta production were two gaffers; one of them had "DTL" listed next to their name.

47.     Mr. Harker spoke with the gaffer with DTL next to her name ("Gaffer–DTL"), and it was his impression she lacked experience as a gaffer. Harker Dec. at ¶ 17.

48.     Mr. Harker observed that the Gaffer–DTL was unable to even properly coil an electric extension cord, which is among the most basic skills of any motion picture electrician. Harker Dec. at ¶ 18.

49.     While preparing the crew's paperwork as part of his duties, Mr. Harker learned the DTL–Gaffer, despite her lack of experience, was compensated more highly than he was, despite him being an experienced electrician.

50.     While the Gaffer–DTL was pleasant, it became clear to Mr. Harker that she had virtually no experience as an electrician or gaffer and limited knowledge of the electrical equipment and work practices on set. Harker Dec. at ¶ 17.

51.     Mr. Harker followed up with questions to both the Gaffer–DTL  and the

Production Supervisor.

52.     Mr. Harker asked Shun Tsuchiya, the production supervisor, what the DTL designation meant. Harker Dec. at ¶ 11.

53.     Tsuchiya explained that the DTL designation was related to a program run by the AICP that applied to the December 14, 2022, Meta production. Harker Dec. at ¶ 12.

54.     The Call Sheet listed a total of nine (9) "DTL" production members working on December 14, 2022.

55.     Because Mr. Harker is white, he was not considered for any of the relevant positions, including leadership roles such as Gaffer, designated as "DTL" on the December 14, 2022, Call Sheet.

56.     During the December 14, 2022 Meta production, Mr. Harker worked with Jasiel Lampkin, who was listed as the "Gaffer–DTL" on the call sheet. Harker Dec. at ¶ 15.

57.     Ms. Lampkin is BIPOC. Harker Dec. at ¶ 16.

58.     After working with Ms. Lampkin, Mr. Harker understands that she lacked experience as a gaffer and would not be qualified for the role but for her BIPOC status. Harker Dec. at ¶ 17.

59.     During the December 14, 2022 Meta production, Mr. Harker worked with Shawn Batey, who was listed as the "Prop Master–DTL" on the call sheet. Harker Dec. at ¶ 19.

60.     Mr. Harker has known of Ms. Batey for many years through IATSE

Local 52. Harker Dec. at ¶ 20.

61.    Ms. Batey is an experienced props professional with extensive connections in the industry. Harker Dec. at ¶ 21.

62.    On the December 14, 2022, Meta production, Ms. Batey conducted the technical scout on behalf of the Property Department without any supervision; acting in the role of a true "Prop Master" rather than a mere apprentice. Harker Dec. at ¶ 22.

63.    Ms. Batey is BIPOC. Harker Dec. at ¶ 23.

64.    Mr. Harker understands that Ms. Batey would not have been in the Prop Master–DTL position but for her BIPOC status. Harker Dec. at ¶ 24.

65.    During the December 14, 2022 Meta production, Mr. Harker worked with Brian "Ishmael" Johnson, who was listed as the "Key Grip–DTL" on the call sheet. Harker Dec. at ¶ 25.

66.    Mr. Johnson acted as the de facto best boy grip, working independently from the key grip, because he was a very experienced grip with industry experience. Harker Dec. at ¶ 26.

67.    Mr. Johnson was not acting as an apprentice to the Key Grip, Martin Flores. Harker Dec. at ¶ 27.

68.    Mr. Harker believes Mr. Johnson was hired or recommended for hire for the Key Grip–DTL position by Martin Flores, the Key Grip on set. Harker Dec. at ¶ 28.

69.    Mr. Harker understands that Mr. Johnson would not have been in the

2Key Grip–DTL position but for his BIPOC status. Harker Dec. at ¶ 29.

70.     When Mr. Harker told Mr. Johnson what the "DTL" designation on the call sheet meant, he was surprised. Harker Dec. at ¶ 30.

71.     Mr. Johnson is BIPOC. Harker Dec. at ¶ 31.

72.     During the December 14, 2022 Meta production, Mr. Harker worked with Jayson Jordan, who was an Electrician–DTL on the set. Harker Dec. at ¶ 32.

73.     Mr. Jordan did not act as an apprentice, and did not shadow anyone; instead, he was fully qualified as an electrician and performed admirably as such. Harker Dec. at ¶ 33.

74.     Mr. Harker believes that Mr. Jordan was hired or recommended for hire for the Electrician–DTL position by Lyon Taylor, the Gaffer on set. Harker Dec. at ¶ 34.

75.     Mr. Jordan is BIPOC. Harker Dec. at ¶ 35.

76.     Mr. Harker understands that Mr. Jordan would not have been in the Electrician–DTL position but for his BIPOC status. Harker Dec. at ¶ 36.

77.     During the December 14, 2022 Meta production, Mr. Harker worked with Christian Cobo, who was an electrician on the set. Harker Dec. at ¶ 37.

78.     Mr. Harker believes Mr. Cobo lacked substantial commercial production experience and connections to the industry. Harker Dec. at ¶ 38.

79.     Mr. Cobo is not BIPOC. Harker Dec. at ¶ 39.

80.     Mr. Cobo was not hired in a "DTL" role. Harker Dec. at ¶ 40.

81.     Mr. Harker noticed throughout the shoot that DTL employees had

12

various skill levels; at least one was an amateur without any marketable skills in their role, while others were experienced professionals who did not shadow their non-DTL equivalents because they were well qualified and did not need to. Harker Dec. at ¶ 41.

82.    The only characteristic all DTL employees shared was their "BIPOC" status. Harker Dec. at ¶ 42.

83.    Mr. Harker has never been employed by BBDO Worldwide. Harker Dec. at ¶ 43.

84.    Mr. Harker has never been employed by Meta Platforms. Harker Dec. at ¶ 44.

85.    Mr. Harker has never been employed by the AICP. Harker Dec. at ¶ 45.

86.    During the December 14, 2022 Meta production, Mr. Harker discovered that Something Ideal planned to pay the DTL employees through a separate system that may have deprived them of their rights under the IATSE Collective Bargaining Agreement ("CBA"). Harker Dec. at ¶ 13.

87.    Mr. Harker informed Something Ideal, through production Supervisor Shun Tsuchiya, that depriving only DTL hires of benefits owed to them under the CBA was racially discriminatory, as the DTL employees were members of racial minorities. Harker Dec. at ¶ 14.

88.    Tsuchiya explained that the DTL designation was related to a program run by the AICP and that Something Ideal was required to follow the DTL program for the December 14, 2022 Meta production. Harker Dec. at ¶ 12.

89.     Since December 14, 2022, Mr. Harker has not been re-hired for any subsequent projects by the Defendants. Harker Dec. at ¶ 46.

### D.     Defendants' Relationship to the DTL Program.

90.     Defendant Meta is listed on the AICP website as a DTL Program Supporter. Double the Line Supporters, AICP, https://bit.ly/47Oz9Oy.

91.     The "Double the Line" supporters are described as follows:

> In addition to our membership, Double the Line is supported by industry-leading clients and agencies. We thank them for their commitment to a more diverse industry and creating opportunities for **BIPOC** crew members.

92.     Something Ideal, LLC, was the production company for the commercial being made for Meta on December 14, 2022.

93.     The FAQ for the DTL Program on AICP's website explains how candidates are selected for participation:

> The role will be selected based on the parameters of the project with potential candidates identified by the production or post production company. The goal of this is for the companies to invest in the building of careers and apprenticeship training over a period of several jobs to ensure the needed experience is received. The agency and the client would commit to covering the cost of the selected role, thereby doubling the line.

*Double the Line*, AICP, https://bit.ly/3OXQ095 (click on "Question: How do I select a candidate for participation?").

94.     Mr. Harker is not asserting that the DTL program was or is an apprenticeship program, only that this is how AICP describes the program.

95.     Based on the very experienced DTL hires, such as Ms. Batey, and the inexperienced hires to senior positions, such as the Gaffer-DTL, it was not an

14

apprenticeship program and an attempt to try and reframe the DTL program as an apprenticeship program, would be a sham designed to justify statutory violations.

96.    Defendant Something Ideal, LLC, participated in the DTL initiative.

97.    Defendant Meta, the client, and/or Defendant BBDO, the agency, committed to "covering the cost of the selected role, thereby doubling the line."

98.    Upon information and belief, Defendant Meta and/or Defendant BBDO had a "clearly labeled" budget identifying the cost of the DTL initiative.

99.    Defendants were aware of and participated in the DTL initiative with full knowledge and intent to discriminate on the basis of race, color, or national origin.

100.   Defendants conspired to implement the DTL initiative and Equity Inclusion program with the goal of creating lasting positions for these DTL individuals.

101.   Defendants conspired and contracted to implement the DTL initiative and to deny and continue to deny Mr. Harker the opportunity to contract for available positions for which he was willing and qualified to do so.

102.   As a result of the discriminatory and retaliatory conduct of the Defendants, Mr. Harker has incurred loss of earnings, earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures.

103.   Defendants acted with malice and/or reckless indifference to Mr. Harker's protected rights.

104.   The willful and wanton conduct of the Defendants described above was outrageous and warrants the grant of punitive damages.

## CLAIMS FOR RELIEF

### Count I
### Violation of the Civil Rights Act of 1866, 42 U.S.C. §1981

105.   Plaintiff repeats and reasserts each and every allegation in paragraphs 1-104 above as if fully set forth herein at length.

106.   42 U.S.C. § 1981 prohibits racial discrimination in the making and enforcement of private contracts.

107.   It protects the rights of "would-be" contractors along with those who have already made contracts.

108.   Congress created a guarantee of racial neutrality in private contracting through the Civil Rights Act of 1866. 42 U.S.C. §1981.

109.   Section 1981 "has a specific function: It protects the equal right of 'all persons' … 'to make and enforce contracts without respect to race.'" *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up).

110.   42 U.S.C. § 1981 permits claims based on intentional discrimination of employment contracts. *Patterson v. McLean Credit Union*, 491 U.S. 164, 182 (1989) ("Of course, some overlap will remain between the two statutes: specifically, a refusal to enter into an employment contract on the basis of race. Such a claim would be actionable under Title VII as a "refus[al] to hire" based on race, 42 U.S.C. § 2000e–2(a), and under § 1981 as an impairment of "the same right ... to make ... contracts ... as ... white citizens," 42 U.S.C. § 1981.")

16

111.    Defendants conspired and agreed to contract based on race, color, or national origin pursuant to the DTL initiative.

112.    But for his race, color, and national origin, Mr. Harker was qualified for the positions reserved by Defendants for "BIPOC" individuals.

113.    Defendants Meta, BBDO, and AICP, jointly and severally, are knowingly and intentionally violating Section 1981 by expressly excluding Mr. Harker from employment through the denial to make and enforce contracts and other contract opportunities because of his race, color, or national origin.

114.    Defendants have acted with malice and/or reckless indifference to Mr. Harker's rights, and thus have caused Mr. Harker to be damaged.

## Count II
## Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1985(3)

115.    Plaintiff repeats and reasserts each and every allegation in paragraphs 1-114 above as if fully set forth herein at length.

116.    The Defendants conspired and agreed to discriminate against Mr. Harker, and to violate his legal rights, because of his race or national origin.

117.    The Defendant AICP designed the racially discriminatory DTL initiative and condoned, encouraged, aided and abetted its implementation and execution, all in violation of Mr. Harker's rights.

118.    The Defendant Meta participated in, condoned, encouraged, facilitated, and aided and abetted the implementation and execution of the racially discriminatory DTL initiative by, among other things, funding it, promoting it, and authorizing or encouraging the use of racially discriminatory hiring practices on,

17

inter alia, the December 14, 2022 Meta production, all in predictable and intentional violation of Mr. Harker's rights.

119.   The Defendant BBDO participated in, condoned, encouraged, facilitated, and aided and abetted the racially discriminatory DTL initiative by, among other things, funding it and authorizing or encouraging the use of racially discriminatory hiring practices on, inter alia, the December 14, 2022 Meta production, all in predictable and intentional violation of Mr. Harker's rights.

120.   The Defendant Something Ideal, LLC, pursuant to its agreements with the other Defendants, participated in, condoned, facilitated, and aided and abetted the racially discriminatory DTL initiative by applying it to the December 14, 2022 Meta production, all in predictable and intentional violation of Mr. Harker's rights.

121.   Mr. Harker brings this claim, in the alternative, against Something Ideal.

122.   The Defendants' actions as described herein constitute an unlawful race-based conspiracy in malicious and willful violation of Mr. Harker's rights contrary to 42 U.S.C. § 1985(3), and thus have caused Mr. Harker to be damaged. *See Rowe Ent., Inc. v. William Morris Agency, Inc.*, 2000 WL 896929, at *13 (S.D.N.Y. July 6, 2000) (holding that a § 1981 claim can satisfy the second element of a § 1985(3) claim that requires deprivation of equal protection of the laws or privileges and immunities) (*aff'd*, 167 F. App'x 227 (2d Cir. 2005) (on appeal, holding only that Plaintiffs' failure to prove intentional discrimination caused their claims to fail, without discussing the interplay between §§ 1981 and 1985).

**Count III**
**Retaliation in Violation of the Civil Rights Act of 1866, 42 U.S.C. §1981**

123.     Plaintiff repeats and reasserts each and every allegation in paragraphs 1-122 above as if fully set forth herein at length.

124.     Mr. Harker communicated to Defendant Something Ideal, that their payment practices may deprive DTL employees of benefits they were owed under the IATSE Collective Bargaining Agreement.

125.     Because the "DTL" category is defined by race, Mr. Harker expressed to Shun Tsuchiya, Something Ideal's production supervisor for the December 14, 2022 Meta production, that depriving DTL employees of benefits owed to them under the CBA was racially discriminatory.

126.     After the December 14, 2022 Meta production, Something Ideal ceased to hire Mr. Harker for future projects, thus refusing to contract with him, based in part on his objection to the way Something Ideal was discriminating based on race.

127.     This constitutes Retaliation in Violation of the Civil Rights Act of 1866. 42 U.S.C. § 1981(b). *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 454 (2008) ("§ 1981(b) in the 'context of employment discrimination ... would include ... claims of ... retaliation.'")

**Count IV**
**Discrimination in Violation of Title VII of the Civil Rights Act of 1965,
42 U.S.C. § 2000e et seq.**

128.     Plaintiff repeats and reasserts each and every allegation in paragraphs 1-127 above as if fully set forth herein at length.

129.     The Defendant Something Ideal, LLC, pursuant to its agreements with

the Defendants Meta and BBDO, and for the purpose of executing Defendant AICP's plan to "push forward demographic shift," created a racially exclusive applicant pool for DTL positions on the December 14, 2022, production that limited, segregated, or classified Mr. Harker in a way as to deprive him, or tending to deprive him, of employment opportunities or adversely affect his status as an applicant or employee because of his race or color.

130.   The Defendant Something Ideal, LLC, pursuant to its agreements with the Defendants Meta and BBDO, and for the purpose of executing Defendant AICP's plan to "push forward demographic shift," paid the DTL–gaffer more than it paid Mr. Harker,  adversely affecting him with respect to his compensation, terms, conditions, or privileges of employment because of his race and color.

131.   Mr. Harker filed a timely charge with the EEOC for discrimination by the Defendant Something Ideal, LLC, on May 31, 2023.

132.   Mr. Harker has a Notice of Right to Sue Letter from the United States Equal Employment Opportunity Commission, dated June 8, 2023, and has exhausted the applicable administrative remedies prior to this suit. Exhibit 1.

133.   Mr. Harker has complied with Title VII's charge filing provisions, 42 U.S.C. §§ 2000e-5(e)(1) and (f)(1).

134.   Something Ideal did not have an application process to hire for the DTL program on the December 14, 2022 Meta production.

135.   There was no public posting of the DTL position available that called for individuals to apply to any DTL position.

136.    Mr. Harker had no knowledge that there were DTL positions available for the December 14, 2022 Meta production.

137.    Something Ideal initiated contact with prospective employees to offer them specific work in accordance with standard industry practice.

138.    Something Ideal created its applicant pool internally and hired from that applicant pool.

139.    Mr. Harker was excluded from that applicant pool because of race or color as the applicant pool only consisted of BIPOC individuals and excluded all non-BIPOC individuals, including white people.

140.    Because Mr. Harker was excluded from that applicant pool, he was excluded from higher paying positions.

141.    A formal application for employment is not required to state a Title VII claim. *Petrosino v. Bell Atlantic*, 385 F.3d 210, 227 (2nd Cir. 2004) ("to be excused from the specific application requirement, an employee must demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer.").

142.    The Defendant's actions as described herein constitute unlawful race and/or color discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and thus have caused Mr. Harker to be damaged.

## Count V
## Retaliation in Violation of Title VII of the Civil Rights Act of 1965,
## 42 U.S.C. § 2000e-2 et seq.

143.    Plaintiff repeats and reasserts each and every allegation in paragraphs
1-142 above as if fully set forth herein at length

144.    Mr. Harker communicated to Defendant Something Ideal, that their
payment practices may deprive DTL employees of benefits they were owed under the
IATSE Collective Bargaining Agreement.

145.    Because the "DTL" category is defined by race, Mr. Harker expressed to
Shun Tsuchiya, Something Ideal's production supervisor for the December 14, 2022
Meta production, that depriving DTL employees of benefits owed to them under the
CBA was racially discriminatory.

146.    Defendant Something Ideal, LLC has not hired Mr. Harker for any
subsequent projects since Mr. Harker questioned Defendants' unlawful DTL hiring
and payment practice, and filed a Title VII claim against Something Ideal.

147.    The Defendant's actions as described herein constitute an unlawful
retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e
et seq., and thus have caused Mr. Harker to be damaged.

## Count VI
## Violation of N.Y. Exec. Law § 296

148.    Plaintiff repeats and reasserts each and every allegation in paragraphs
1-147 above as if fully set forth herein at length

149.    The New York Human Rights Law prohibits the Defendants:

A. From discriminating against Mr. Harker based on his race, color,

national origin, or age.

B. From refusing to hire or employ or to bar or to discharge him, or to discriminate against him in compensation or in terms, conditions or privileges of employment, based on his race, color, national origin, or age.

C. From posting the AICP program online and making any inquiry in connection with prospective employment, which expresses directly or indirectly, any limitation, specification or discrimination as to race, color, or national origin unless based upon a bona fide occupational qualification.

D. From denying or withholding from Mr. Harker the right to be admitted to or participate in the AICP initiative because of his race, color, or national origin.

E. From discriminating against Mr. Harker in his pursuit of employment and contracting opportunities subject to the AICP program, and in the terms, conditions or privileges thereof, because of his race, color, or national origin.

150. The public policy of this State condemns racial discrimination. "No person shall, because of race, color, creed, or religion, be subjected to any discrimination in his civil rights." (N. Y. Const., art. I, § 11, adopted by Constitutional Convention of 1938; approved by the People, Nov. 8, 1938.).

151. Likewise, it is unlawful to aid, abet, incite, compel, or coerce any of the acts forbidden by the New York Human Rights Law. N.Y. Exec. Law § 296, et seq.

152. The Defendants Meta, Something Ideal, and BBDO, in concert, aided and abetted, and condoned by the AICP, denied Mr. Harker employment and contracting opportunities solely because of his race, color, and/or national origin.

153. These Defendants, aided and abetted by AICP, placed less-qualified DTL "BIPOC" employees in leadership positions and paid the DTL "BIPOC" employee his superior  more than Mr. Harker solely because of race, color, or national origin.

154.    The Defendants violated New York's Human Rights Law, and thus have caused Mr. Harker to be damaged.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Harker respectfully requests that this Court enter judgment in his favor and against Meta, AICP, BBDO, and Something Ideal, LLC, jointly and severally with respect to all defendants identified in each separate Count, and provide the following relief:

A.    A declaratory judgment that the Double the Line Program violates 42 U.S.C. §§ 1981, 1985(3) and/or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 et seq.

B.    A declaratory judgment that the Defendants are violating New York's Human Rights Law, N.Y. Exec. Law § 296.

C.    A permanent injunction barring the Defendants from operating the "Double the Line" program and otherwise violating applicable nondiscrimination laws.

D.    An order for such equitable relief, including back pay, will make James Harker whole for the Defendants' conduct; compensatory damages; punitive damages; and prejudgment and post-judgment interest.

E.    Awarding compensatory damages to Mr. Harker for past pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures, which he has suffered as a result of Defendants' improper conduct.

F.    An award of punitive damages.

G.    An award of other such damages as appropriate for violations of Title VII, 42 U.S.C. §§ 1981 and 1985(3), and the New York Human Rights Law.

H.    An order for damages pursuant to 42 U.S.C. § 1986.

I.    Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws.

24

    J.      Such other relief as the Court deems just, proper, or equitable, including other equitable and injunctive relief providing restitution for past violations and preventing future violations.

## JURY DEMAND

The plaintiff herein demands trial by jury on all Counts so triable.

Dated: New York, New York
      November 22, 2023

<u>Respectfully submitted,</u>

<u>*/s/ Ronald A. Berutti*</u>

Ronald A. Berutti
MURRAY-NOLAN BERUTTI LLC
30 Wall Street
8th Floor
New York, New York 10005
(212) 575-8500
ron@murray-nolanberutti.com

<u>*/s/ Nicholas R. Barry*</u>

Nicholas R. Barry (TN Bar No. 031963)
(pro hac vice granted)
Ian Prior (MA Bar No. 655704)
(pro hac vice forthcoming)
Julia Zsuzsa Haller (NY Bar No. 2851426)
(pro hac vice forthcoming)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave, SE #231
Washington, DC 20003
Telephone: (615) 431-9303
Facsimile: (513) 216-9882
nicholas.barry@aflegal.org
ian.prior@aflegal.org
juli.haller@aflegal.org
*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

This document complies with Local Rule 11.1(b) because it uses a 12-point font.