UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

JAMES HARKER,

      Plaintiff,

  -v-                                          No.  23-CV-7865-LTS

META PLATFORMS, INC., ASSOCIATION
OF INDEPENDENT COMMERCIAL
PRODUCERS, INC., SOMETHING IDEAL,
LLC, d/b/a "M SS NG P ECES," and BBDO
WORLDWIDE, INC.,

      Defendants.

-------------------------------------------------------x

<u>MEMORANDUM ORDER</u>

      Plaintiff James Harker ("Plaintiff" or "Mr. Harker") brings this action against his former employer, Something Ideal, LLC ("Something Ideal"), and a group of defendants comprised of Meta Platforms, Inc. ("Meta"), Association of Independent Commercial Producers, Inc. ("AICP"), and BBDO Worldwide, Inc. ("BBDO," and together, the "Non-Employer Defendants"), asserting six causes of action related to "a race-based hiring program called 'Double the Line'" ("DTL").  (<u>See</u> docket entry no. 34 (the "Amended Complaint" or "AC").)  Before the Court are motions by Something Ideal and the Non-Employer Defendants, respectively, to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Docket entry nos. 39, 42, 43 (the "Motions").)  Plaintiff asserts that the Court has jurisdiction of his federal claims pursuant to 28 U.S.C. section 1331.

      The Court has reviewed carefully all of the parties' submissions in connection with the Motions.  For the following reasons, the Court grants both Motions, dismissing the

Amended Complaint for lack of standing.

BACKGROUND

The following facts are taken as true for the purposes of this motion practice.

Mr. Harker has over twenty-seven years of experience working as an electrician on major commercial, feature film, and television productions; most of his work was done as a gaffer, best boy, or electrician, "but he would like to increase his experience as a gaffer."[1] (AC ¶¶ 34-35.) On December 12, 2022, Mr. Harker received an email from the production supervisor for a commercial (the "Commercial") being made on December 14, 2022 (the "Production") and was offered a position as the best boy electrician on the Production. (Id. ¶ 40.) The Commercial was being made by Something Ideal, a production company, on behalf of Meta, its client, and BBDO, a commercial agency. (See id. ¶¶ 42, 97-98.) "Mr. Harker did not apply for a position and was unaware of any application process[,]" but he accepted the best boy electrician position. (Id. ¶¶ 41, 44.)

When Mr. Harker arrived at the Production on December 14, 2022, he noticed that the Call Sheet listed two gaffers, one of whom had "DTL" listed next to her name (the "DTL-Gaffer"). (AC ¶ 46.) It was Mr. Hacker's impression, after speaking with the DTL-Gaffer and observing her work, that "she lacked experience as a gaffer." (Id. ¶¶ 47-48.) The DTL-Gaffer, "despite her lack of experience, was compensated more highly than" Mr. Harker on the Production. (Id. ¶ 49.)

Mr. Harker asked the production supervisor what the DTL designation meant, and he learned that "the DTL designation was related to a program run by the AICP." (AC

---

[1]  "A gaffer is the most senior or highest-level electrician on a production, while a best boy electrician has supervisory duties over the other electricians and reports to the gaffer." (AC ¶ 35.)

¶ 53.)  To participate in the DTL program, clients and commercial agencies "agree to double the role of any single position on" a job and, in doing so, "agree to cover the costs to hire a BIPOC candidate to work alongside the chosen role."  (Id. ¶ 22.)[2]  The stated goal of the DTL program is to "increase diversity and inclusion with an emphasis on leadership positions" and to allow candidates who "ha[ve] not previously had access to [the commercial production] business, but [are] qualified in the role to have access to the production to learn the nuances around commercial production in a real, hands on way."  (Id. ¶¶ 24, 30.)  To participate in the program, the production company is responsible for "identifying, hiring, and educating" the DTL candidates.  (Id. ¶ 31.)

For the Production, the Call Sheet listed a total of nine production members with the DTL designation.  (AC ¶ 54.)  The Amended Complaint alleges that several production members with the DTL designation "had various skill levels; at least one was an amateur without any marketable skills in their role, while others were experienced professionals who did not shadow their non-DTL equivalents because they were well qualified and did not need to."  (Id. ¶ 81.)  "The only characteristic all DTL employees shared was their 'BIPOC' status."  (Id. ¶ 82.)

Mr. Harker also discovered, during the Production, "that Something Ideal planned to pay the DTL employees through a separate system that may have deprived them of their rights under the IATSE Collective Bargaining Agreement ('CBA')."  (AC ¶ 86.)  Upon this discovery, on December 14, 2022, Mr. Harker informed the production supervisor "that depriving only DTL hires of benefits owed to them under the CBA was racially discriminatory, as the DTL employees were members of racial minorities."  (Id. ¶ 87.)  "Since

---

[2]     The AICP defines "BIPOC" to mean 'Black Indigenous People of Color'."  (AC ¶ 23.)

December 14, 2022, Mr. Harker has not been re-hired[,]" nor has he formally applied or otherwise expressed interest in any roles, "for any subsequent projects by the Defendants." (Id. ¶ 89.)

DISCUSSION

Standing

An action must be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate it. FED. R. CIV. P. 12(b)(1); see also Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova, 201 F.3d at 113. When determining a motion to dismiss an action for lack of subject matter jurisdiction, the Court must accept all factual allegations pled in the complaint as true, Nat. Res. Def. Council v. Johnson, 461 F.3d 164, 171 (2d Cir. 2006), but the Court may also consider relevant materials beyond the pleadings. Makarova, 201 F.3d at 113.

Article III of the Constitution of the United States restricts the jurisdiction of federal courts to actual cases or controversies. See Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). To demonstrate Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). To plead an Article III "injury in fact" in a case like this, "challeng[ing] an allegedly discriminatory selection policy," a plaintiff must allege that he "actually applied for the position at issue." Dowdy v. N.Y.C. Dep't of Sanitation, No. 22-CV-6284-ALC, 2023 WL 6258536, at *5 (S.D.N.Y. Sept. 26, 2023); Jackson-Bey v. Hanslmaier, 115 F.3d 1091, 1096 (2d Cir. 1997) (holding that plaintiff must allege that he

"submit[ted] to the challenged policy"). The application requirement may be excused "where a plaintiff makes a substantial showing that appl[ying] would have been futile." Dowdy, 2023 WL 6258536, at *5 (citation omitted) (emphasis added). "In addition to these requirements, a plaintiff asserting standing for a Title VII claim 'must show that they are "able and ready" to apply', even if an application would be futile." Id. (citation omitted). "This is a 'highly-fact specific' undertaking and requires more than the non-applicant's belief that they meet the 'minimum qualifications' and are 'able and ready.'" Id. (citation omitted).

Here, Mr. Harker does not allege that he applied for a gaffer position—with or without a DTL designation—on the Production or at any other relevant time. Instead, Mr. Harker presents several arguments as to why this reality is not fatal to his standing to challenge the DTL policy. The Court considers each argument in turn:

First, Mr. Harker argues that he "could not apply to a DTL gaffer position because there was no application process[,]" and because "he did not know about the DTL program." (Docket entry no. 45 ("Pl. Non-Empl. Mem.") at 8 (emphasis in original).) While there may have been no formal application process for the DTL-Gaffer role, and while Mr. Harker was not aware of the DTL program, he fails to allege that he made any attempt to express his interest in working as a gaffer on the Production. This failure is fatal to his claim, because standing to challenge a discriminatory policy "requires an intent that is concrete" that "must go beyond a 'few words of general intent'." Dowdy, 2023 WL 6258536, at *5-6 (citing Carney v. Adams, 592 U.S. 53, 64 (2020)). The Supreme Court has emphasized that plaintiffs with standing can typically make some showing that "they had applied in the past, there were regular opportunities available with relevant frequency, and they were 'able and ready' to apply for them." Carney, 592 U.S. at 66. Here, in contrast, Mr. Harker proffers that he "did not seek to be a non-DTL

gaffer" or otherwise express a concrete interest in performing gaffer work.  (Pl. Non-Empl. Mem. at 8.)  This fact is noteworthy because Mr. Harker, who claims that he suffered humiliation and loss of compensation because of the DTL policy, also alleges that the DTL and non-DTL gaffer roles involved the same compensation and set of responsibilities.  (See also AC ¶¶ 49, 81.)  Likewise, although Mr. Harker could not have applied to a DTL-Gaffer position before he learned about the program, Mr. Harker never applied or otherwise expressed his interest in being considered for a DTL-Gaffer role in the future, even after he learned about the program on December 14, 2022.  There is also no dispute that Mr. Harker, who has over twenty-seven years of experience working in the commercial production industry, knew that a gaffer position would be available on future commercial productions.[3]  This context "suggests an abstract, generalized grievance, not an actual desire to become" a DTL-Gaffer.  Carney, 592 U.S. at 63.

  Second, Mr. Harker argues that he could not apply to the DTL-Gaffer position because "the Defendants agree to select candidates based on their race."  (Pl. Non-Empl. Mem. at 8.)  Arguing that an application is futile due to a racially discriminatory policy alone, however, is not sufficient to establish standing.  In Do No Harm v. Pfizer, Inc., 646 F. Supp. 3d 490 (S.D.N.Y. 2022), aff'd, 96 F.4th 106 (2d Cir. 2024), for example, the court concluded that white and Asian-American members of an organization did not have standing to challenge a fellowship program that required applicants to "meet the program's goals of increasing the pipeline for Black/African . . ., Latino/Hispanic, and Native Americans" because they did not apply for the program.  Id. at 505.  Critically, the plaintiff organization had not adequately shown that at least

---

[3]   Mr. Harker's argument that the gaffer role had already been filled by the time he was offered the role as the best boy electrician on the Production does not alter the fact that Mr. Harker has not alleged that he ever expressed interest in gaffer work to any defendant.  (Pl. Non-Empl. Mem. at 8 n.3.)

one of its members was "ready and able" to apply to the fellowship.  Id. at 506.  So too here: nowhere in his briefing does Mr. Harker argue that he was "ready and able" to apply (informally or otherwise) to work as a DTL-Gaffer, and he only alleges that "he would like to increase his experience as a gaffer."  (AC ¶ 37.)  Nor does he provide any indication as to why, as an industry veteran with twenty-seven years of experience, he would seek to participate in a program designed to allow candidates who "ha[ve] not previously had access to [the commercial production] business, but [are] qualified in the role to have access to the production to learn the nuances around commercial production in a real, hands on way" or be able to demonstrate that he was qualified on experiential grounds to participate in such a program.  (AC ¶ 30.)

The Non-Employer Defendants argue that Mr. Harker's "extensive experience" in the industry rendered him "unqualified for the DTL Program irrespective of his race."  (Docket entry no. 44 ("Non-Empl. Mem.") at 9.)  Mr. Harker's response—that the DTL program was not actually an apprenticeship program designed to improve access to the commercial production industry and that he had "identified several DTL employees who had extensive experience in their chosen profession and roles on set" (see Pl. Non-Empl. Mem. at 9)—does not salvage his claim.  As an initial matter, Mr. Harker's allegation that the DTL program was not a genuine apprenticeship program is contradicted by other allegations in the Amended Complaint, including that the DTL was advertised as an "apprenticeship program" and that the individual hired for the DTL-Gaffer position that Mr. Harker allegedly desired "lacked experience as a gaffer."  (AC ¶¶ 47, 93, 95.)  Furthermore, Mr. Harker's assessment of the experience of individuals awarded other roles—for which he does not claim relevant skills, and in which he never expressed interest in performing—are not probative of his qualifications for the DTL-Gaffer position he claims to have wanted, which did, in fact, go to someone he complains was

not qualified. Mr. Harker's allegations fail to support standing, which "must be shown affirmatively, and . . . is not made by drawing from the pleadings inferences favorable to the party asserting it." Dowdy, 2023 WL 6258536, at *4 (quoting Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008)).

One court in this District recently indicated that a plaintiff might demonstrate that he is "ready and able to apply" by alleging "what the requirements are for [the position] and whether [Plaintiff] meets them at the present time." Samuels v. New York City, No. 23-CV-10045-AS, 2024 WL 3742544, at *2 (S.D.N.Y. Aug. 9, 2024). While the Amended Complaint notes the requirements that the DTL program advertised, Mr. Harker appears to allege that the only genuine requirement of the program was BIPOC status. (See AC ¶ 82 ("The only characteristic all DTL employees shared was their 'BIPOC' status.").) This conclusory allegation is not sufficient to render immaterial the other stated requirements of the program and thus is also insufficient to demonstrate his standing to challenge the program. See Samuels, 2024 WL 3742544, at *1-2 (granting motion to dismiss for lack of standing where Plaintiff alleged that Defendant provided grants exclusively to women and transgender individuals but failed to allege other requirements of the grant and satisfaction thereof).

Third, Mr. Harker further argues that he has standing, despite not having applied to the DTL-Gaffer position, because he satisfies an exception established in Petrosino v. Bell Atlantic, 385 F.3d 210 (2d Cir. 2004), to the requirement that a plaintiff actually have applied for a position in order to plead a failure-to-promote claim. (Docket entry no. 46 ("Pl. SI Mem.") at 6.) In Petrosino, the Second Circuit established a narrow exception to the general rule that, to frame a viable failure-to-promote claim, a plaintiff must plead that he applied to the position unless "(1) the vacancy at issue was not posted, and (2) the employee either had (a) no

knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." 385 F.3d at 227. Mr. Harker's argument, however, is unpersuasive because the Petrosino exception is relevant to the merits issue of whether a plaintiff has stated a failure-to-promote claim under Title VII[4]—not whether a plaintiff has established standing to bring such a claim. In other words, a court would have to determine that a plaintiff has standing to bring before assessing the merits question of whether the Petrosino exception applies to their failure-to-promote claim. Plaintiff here has provided no viable basis for such a determination. Indeed, the Supreme Court has made clear that merely identifying a "statutory violation," without pleading personal harm arising from the violation, does not "suffice to afford a plaintiff standing." TransUnion, 594 U.S. at 429.

Arguing for the impropriety of this result, Mr. Harker asserts that, "[i]f the court determined that the Petrosino rule does not apply here, then the entire commercial production industry (and any that uses a similar method to hire), has received a carte blanche exception from Title VII and § 1981." (Pl. SI Mem. at 6.) This argument is legally baseless because it ignores the fact that, even in Petrosino, the Court required the plaintiff to, at a minimum "tell[] her supervisors that she wished to be considered for" the job opportunities that she sought. 385 F.3d at 228. Here, Mr. Harker does not allege any facts suggesting that he communicated his desire to work as a gaffer, or that Something Ideal could have known that he was interested in working as a gaffer. Therefore, the Petrosino exception cannot salvage his claim.

---

[4]    The Second Circuit has, furthermore, noted that this exception also "may or may not apply in the context of a failure to hire." Rich v. Assoc. Brands Inc., 559 F. App'x 67, 69 (2d Cir. 2014).

Leave to Amend

Defendants argue that leave to amend should be denied, (docket entry no. 41 ("SI Mem.") at 24; Non-Empl. Mem. at 25), pointing out that Mr. Harker has already amended his complaint once after refusing to engage in pre-motion communications as required by the undersigned's individual practice rules. Mr. Harker requests that the Court "decline to address the issue" until a motion for leave to replead is filed. (Pl. SI Mem. at 17.) Further leave to amend the complaint is denied. Notwithstanding two rounds of dismissal motion practice that have included substantial briefing on the issue of standing, he has not proffered any additional facts that suggest that he can augment his already-amended pleading to establish that he has standing to pursue his claims.

## CONCLUSION

For the foregoing reasons, the Motions are granted to the extent they seek dismissal of the Amended Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). The Clerk of Court is respectfully directed to enter judgment dismissing the Amended Complaint in its entirety and close this case. This Memorandum Order resolves docket entries nos. 39, 42, and 43.

SO ORDERED.

Dated: New York, New York
August 29, 2024

    /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge